NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MERCER COUNTY CHILDRENS MEDICAL DAYCARE, LLC; *et al*, <br><br> Plaintiffs, <br><br> v. <br><br> MARY O'DOWD, *et al.*, <br><br> Defendants. | Civ. No. 13-1436 <br><br> **OPINION** |

THOMPSON, U.S.D.J.

This matter comes before the Court upon the Motion of Defendant Carlisle & Associates, LLC ("Carlisle") for Summary Judgment. (ECF No. 131). Plaintiffs oppose. (ECF No. 149). The Court has issued the Opinion below based on the parties' written submissions and having heard oral argument. For the reasons stated herein, Defendant's Motion for Summary Judgment will be granted.

BACKGROUND

In light of the numerous proceedings in this matter, the Court will briefly outline here only those facts necessary for the present Motion. Plaintiffs are the Mercer County Children's Medical Daycare, LLC ("Mercer") and ten individual children who were unable to obtain pediatric medical daycare services from Mercer as a result of regulatory actions taken by the

1

State of New Jersey,[1] its departments, and its officials.[2]  Pediatric medical daycare ("PMDC") is a program managed by NJDOH to provide medically necessary services to children who are technology-dependent or medically unstable.  (Am. Compl. ¶¶ 60, 69, ECF No. 28).  PMDC facilities such as Mercer are licensed by NJDOH and provide services for which they receive reimbursement from Medicaid.  (*Id*. at ¶¶ 58–59, 69, 76).  On November 3, 2003, NJDOH placed a moratorium on licensing PMDC facilities after an audit found that the licensing practices were incompatible with NJDHS rules.  (*Id*. at ¶¶ 63, 74).  Specifically, licenses had been issued based on a 30 square feet per person rule, but NJDHS had a limit of 27 patients per facility per day ("27 Rule").  (*Id*. at ¶¶ 65–74).  At that point, Mercer had a PMDC license for 70 to 72 patients based on the facility's square footage.  (*Id*. at ¶ 75; License, Gertsberg Aff. Ex. C, ECF No. 149-15).  On November 16, 2009, the 27 Rule was officially adopted and took effect on July 1, 2010.  *See* N.J.A.C. §§ 8:43J–2.3(b), 10:166–2.1(a)(3).

In early March 2011, New Jersey's Department of Health and Senior Services ("NJDHSS") fined Mercer, citing violations of the 27 Rule, among other things.  (NJDHSS Notice of Curtailment, Gertsberg Aff. Ex. F, ECF No. 149-18).  Mercer was directed to retain a Consultant Administrator for at least 25 hours per week in order to come into compliance with applicable New Jersey PMDC licensing regulations.  (*Id*.).  Mercer initially hired New Era Health Associates Corporation as its Administrative Consultant, but then replaced them with Defendant Carlisle.  (Am. Compl. ¶¶ 18, 24–46; New Era Consulting Agreement, Gertsberg Aff.

---

[1] The term "State Defendants" includes the following Defendant entities: New Jersey Department of Health ("NJDOH"); New Jersey Department of Human Services ("NJDHS"); Office of the Comptroller; and New Jersey Medicaid Fraud Division ("NJMFD").

[2] The term "State Officials" includes the following individual Defendants: Matthew Boxer, the State Comptroller; Mark Anderson, NJMFD Inspector General; Deborah Gottlieb, Director of Program Compliance and Health Care Financing for NJDOH; Michael Kennedy, New Jersey Deputy Attorney General; John Guhl, DMAHS Director; Jennifer Velez, NJDHS Commissioner; Mary O'Dowd, NJDOH Commissioner; and Governor Christopher Christie.

Ex. I, ECF No. 149-21; Signed Carlisle Consulting Agreement, Gertsberg Aff. Ex. V, ECF No. 149-34). Plaintiffs claim that Mercer retained Carlisle based on the recommendation of Deborah Gottlieb at NJDOH and because administrators "felt [it] was our only alternative given the situation" because "we didn't know who would be approved or not approved and how long it would take." (Bunting Dep., Gertsberg Aff. Ex. A at 39:2–11, ECF No. 149-12; Grissom Dep., Gertsberg Aff. Ex. B at 144:17–145:25, 147:21-24, ECF No. 149-13).

Beverlyn Grissom is a shareholder and Vice President of Horizon Pediatric Systems, Inc., which is the sole owner of Mercer, and Carl Underland is the owner of Carlisle. (Grissom Dep., Gertsberg Aff. Ex. B at 12:18–14:6, 145:17–147:10). Between May 10 and May 13, 2011, Grissom and Underland exchanged e-mail drafts of the Carlisle consulting contract and had discussions over the phone about the terms of the contract.[3] (Gertsberg Aff. Exs. K, M, N, U,

---

[3] Specifically, on May 10, 2011, Underland e-mailed Grissom a draft contract providing for 12 months of "state-mandated 25 hours minimum hours per week" of administrative consulting services for a monthly fee of $25,000. (Grissom Dep., Gertsberg Aff. Ex. B at 156:9–157:7, 162:19-163:6; May 10, 2011 email from Michele Nuccio to Berverlyn Grissom and Draft Contract for Consulting Services, Stoma Certification Ex. J). On May 12, 2011, Underland e-mailed Grissom, referencing a 30-day cancellation provision and mistakenly attached the wrong contract, which was between Comprehensive Communication Group ("CCG") and Carlisle and had completely different payment terms, including a 30-day provision. (Grissom Dep., Gertsberg Aff. Ex. B at 171:2-10, 173:23-174:1; Email from Carl Underland to Beverlyn Grissom and Draft Contract and Redlined Version of the Contract from Comprehensive Communications Group, Stoma Certification Ex. K). Plaintiffs claim that the body of the e-mail, which mentions a 30-day term, was intended for Mercer; Carlisle asserts that the entire e-mail and its attached contract were intended to be sent to CCG. (*Compare* Underland Dep., Stoma Certification Ex. I at 102:5-103:2, 104:3-15, with Grissom Aff., ¶ 10; May 12, 2011 Email from Carl Underland to Beverlyn Grissom, Gertsberg Aff. Ex. N). On May 13, 2011, Underland's assistant e-mailed an apology to Grissom for the confusion and attached a "corrected" contract, which was signed by Underland, very similar if not identical to the May 10, 2011 draft, and did not include a 30-day cancellation provision. (Grissom Dep., Gertsberg Aff. Ex. B at 179:13-20; May 13, 2011 Email from Michele Nuccio to Beverlyn Grissom and Contract Executed by Carlisle & Associates, LLC, Stoma Certification Ex. M). Grissom forwarded this "corrected" version to Sue Viola to submit to NJDHSS for approval, but did not mention any missing terms or continuing negotiations. (Grissom Dep., Gertsberg Aff. Ex. B at 182:22-183:11, 184:3-20; Email from Beverlyn Grissom to Sue Viola, Stoma Certification Ex. N). Grissom claims that after receiving the "corrected" contract, she told Underland over the phone about the missing 30-

3

ECF Nos. 149-23, 149-25, 149-26, 149-33). The parties dispute the contents of these discussions. Grissom claims that Underland agreed to include a 30-day cancellation provision in the contract, making it a month-to-month contract rather than a 12-month fixed term contract. (Grissom Dep., Gertsberg Aff. Ex. B at 187:9–189:25). Underland denies discussing a 30-day cancellation provision. (Underland Dep., Stoma Certification Ex. I at 104:24–105:7, ECF No. 131-8).

Furthermore, according to Plaintiffs, on May 20, 2011, Grissom, Sue Viola (Mercer's President), Michelle Bunting (Mercer's CEO), and Sue Thompson (Mercer's Administrator) met at Carlisle's office for the contract signing, and Grissom verified the presence of a 30-day cancellation provision in the contract, but before Thompson was able to sign it, Underland found a typo in the spelling of a name and took the entire contract in order to correct the typo. (Bunting Aff., ¶¶ 20-22, ECF No. 149-4; Grissom Aff., ¶¶ 15-17, ECF No. 149-6; Bunting Dep. at 59-61, Gertsberg Aff. Ex. A; Grissom Dep. at 191-93, Gertsberg Aff. Ex. B). Plaintiffs claim that because Grissom had verified the contract, she, Viola, and Bunting left for their next appointment; Underland returned with a contract, and Thompson signed it without reading it. (Grissom Aff., ¶ 18; Bunting Aff., ¶ 23; Bunting Dep. at 60, 62, Gertsberg Aff. Ex. A; Grissom Dep. at 196-97, Gertsberg Aff. Ex. B). Mercer also paid the initial $25,000 first month's fee after the contract was signed.[4] (Bunting Aff., ¶ 19). Plaintiffs allege that Carlisle tricked them into signing the wrong contract by swapping out a contract with a 30 day provision for one that

---

day term and that Underland promised to fix it by the contract's signing on May 20, 2011. (Grissom Aff., ¶ 12; Grissom Dep., Gertsberg Aff. Ex. B at 187:9-13).

[4] Plaintiffs assert that this $25,000 was for June 2011 services whereas Carlisle asserts that the $25,000 was for May 2011 services. (*Compare* Bunting Aff., ¶ 19, with August 3, 2011 email from Carl Underland to Beverlyn Grissom and Michelle Bunting, Stoma Certification Ex. U, ECF No. 131-11).

4

omitted this term and had incorrect dates, neither of which Mercer had agreed to. (Pl.'s Br. at 7, ECF No. 149).

Carlisle denies the contract switching and claims that Mercer first alleged fraud on August 3, 2011, two months after the contract was executed and Carlisle had already been providing services under the contract. (Underland Dep. at 124; Bunting Dep. at 66-68, Gertsberg Aff., Ex. A; December 2, 2014 Certified Answers to Interrogatories by Mercer County Children Medical Daycare Center, Stoma Certification Ex. V, ECF No. 131-8). However, even after the discovery of the alleged fraud, Mercer did not seek to terminate the contract with Carlisle and subsequently paid Carlisle an additional $75,000 for services performed under the contract. (Bunting Aff. ¶ 42). At the beginning of August, Carlisle told Mercer that it would stop providing services until it was paid and had Defendant Louis Greenwald, who is Carlisle's Vice President and Corporate Counsel as well as a New Jersey Assemblyman, reach out to Mercer's outside counsel by phone to collect the money owed. (*Id.* at ¶ 39; August 3, 2011 email from Carl Underland to Beverlyn Grissom and Michelle Bunting, Stoma Certification Ex. U, ECF No. 131-11). Around this time, Mercer alleges that Carlisle contacted Deborah Gottlieb at NJDOH, informed her of Mercer's failure to pay Carlisle, asked for her help in the matter, and made false statements about Mercer that damaged its reputation. (Gertsberg Aff. Exs. Q, R, S, ECF Nos. 149-29, 149-32, 149-31). Carlisle claims that it provided services to Mercer as required under the contract until November 2011, at which time it terminated the contract because Mercer failed to pay. (November 30, 2011 Letter of Termination, Stoma Certification Ex. Y, ECF No. 131-11; Grissom Dep. at 224: 14–225:2, ECF No. 149-13). Mercer replaced Carlisle with another consultant in November 2011 but ultimately closed down in July 2012. (Bunting Aff. ¶ 45).

Plaintiffs filed their Complaint on March 8, 2013 and amended it on May 16, 2013. (ECF No. 28). On February 10, 2014 and March 4, 2014 the Court granted in part Defendants' Motion to Dismiss the Amended Complaint, leaving only Counts II (preemption), VI (fraud by Greenwald), and VII (fraud by Carlisle) remaining. (ECF Nos. 59, 60, 69, 76, 77). On September 14, 2015, the Court granted judgment in favor of State Defendants and State Officials on Count II, and on September 18, 2015, the Court granted summary judgment to Greenwald on Count VI. (ECF Nos. 160, 165). Presently before the Court is Carlisle's motion for summary judgment on the sole remaining claim in the case, Count VII (fraud by Carlisle).

## DISCUSSION

A.  Legal Standard

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Id.* When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n.2 (3d Cir. 1983).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Then, "when a properly supported motion for

6

summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson,* 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

The non-movant's burden is rigorous: it "must point to concrete evidence in the record;" mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. *Orsatte v. N.J. State Police,* 71 F.3d 480, 484 (3d Cir. 1995); *Jackson v. Danberg,* 594 F.3d 210, 227 (3d Cir. 2010) (citations omitted) ("[S]peculation and conjecture may not defeat summary judgment.").

B. Analysis

Count VII of the Amended Complaint alleges fraud—specifically, that Carlisle committed fraud by deceiving Mercer into believing it was signing the agreed upon contract and instead tricking Mercer into signing a draft that Mercer had refused to sign and which did not incorporate the parties' agreement. (Am. Compl. at 51, ECF No. 28). Carlisle presently moves for summary judgment on this claim.

To establish common law fraud in New Jersey, a plaintiff must show: (1) a material misrepresentation of fact, (2) knowledge or belief by the defendant of its falsity, (3) intent that the other person rely on the statement, (4) reasonable reliance by that other person, and (5) resulting damage. *See Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (citing *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 691 (1997)); *RNC Sys., Inc. v. Modern Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012) (indicating that the elements of common law fraud and fraudulent inducement are the same).

Carlisle argues that it is entitled to summary judgment because Plaintiffs have failed to demonstrate any misrepresentation or trickery, and have failed to demonstrate that they suffered any damages. (Def.'s Br. at 12, 15, ECF No. 131-1). Upon review of the record, the Court finds

that Plaintiffs have failed to raise a genuine dispute of material fact on their fraud claim against Carlisle, because they have not shown that a material misrepresentation occurred, or that they suffered resulting damages that exceed what they would owe Carlisle under restitution.

1. First Element: Material Misrepresentation

Plaintiffs allege, with references to Grissom's deposition testimony, that Underland made false statements when he agreed over the phone to include a 30-day cancellation provision but then failed to include this term in the drafts exchanged over e-mail and when he switched the contracts at the signing. Whether or not there was a misrepresentation is in dispute—Grissom claims Underland made these statements, but Underland denies them. However, the law requires such misstatements to be material. Grissom and Bunting claimed in deposition that Mercer would not have agreed to a contract without a 30-day provision because they could not afford a 12-month contract, but Mercer's actions contradict this testimony. Specifically, even after "discovering" in August 2011 that the contract Mercer signed did not contain such a clause, Mercer never sought to terminate the contract and even paid an additional $75,000 owed under the contract. In addition, Grissom and Bunting claim that they chose Carlisle as the consultant because they had been receiving multiple fines from NJDOH, were referred to Carlisle by Gottlieb at NJDOH, and felt like Carlisle was the only consultant NJDOH would approve, which suggests that they would have contracted with Carlisle anyway. Given these circumstances, no jury could find that Carlisle's alleged misstatements were material to Mercer's decision to contract with Carlisle.

2. Fifth Element: Resulting Damages

Plaintiffs claim that they were damaged because they had to pay more to Carlisle than they otherwise would have absent fraud and that the fraudulent contract led to Carlisle making

8

false and damaging statements about Mercer to NJDOH.  However, the remedy for fraudulent inducement into a contract is that the contract is voidable at the election of the defrauded party. *See, e.g., Belani v. Grover*, No. A-5280-07T1, 2009 WL 4255493, at *6 (N.J. Super. Ct. App. Div. Nov. 25, 2009); *Marcangelo v. Boardwalk Regency Corp.*, 847 F. Supp. 1222, 1230 (D.N.J. 1994); *Massey v. Trump's Castle Hotel & Casino*, 828 F. Supp. 314, 325 (D.N.J. 1993).  If the injured party chooses to rescind the contract, it still must pay restitution for any services received.  *See Marcangelo*, 847 F. Supp. at 1231.  Here, Carlisle alleges that it provided services under the contract from May to November 2011 but only received $100,000 and was not paid for services from September to November 2011.  To the extent Plaintiffs assert that they elect to rescind the contract, they have not made any arguments to demonstrate that they were harmed more than any amount that Carlisle would be entitled to recover under restitution.

       Plaintiffs argue that Carlisle's alleged fraud led to additional fines and the disintegration of Mercer's relationship with the State, which led to Mercer's eventual closure in July 2012. (*See* Pl.'s Br. at 32-33, ECF No. 149).  Plaintiff's support for this claim in the record is a single email from Gottlieb, written after corresponding with Carlisle, to Mercer's attorney stating that Mercer had no credibility. (*See* Pl.'s Statement of Disputed Material Facts at ¶ 60-64).  But Mercer's troubled relationship with the State predated its relationship with Carlisle, and in fact, led Mercer to hire Carlisle in the first place.  Mercer had already received over $1.7 million in fines before Carlisle's relationship with Mercer started.  Thus, Plaintiff has not shown that the reason for Mercer's loss of credibility was Carlisle's correspondence with Gottlieb, nor that any loss of credibility generated by Carlisle's comments was responsible for Mercer's additional fines and the disintegration of its relationship with the State.  Gottlieb's email does not prove this causal connection, nor does any other part of the record.  Attributing additional fees and

breakdown in the relationship with the State to Carlisle is entirely speculative and thus, not capable of defeating summary judgment. Considering this, no reasonable jury could find based on the record that Mercer suffered damages that exceeded the amount owed to Carlisle for its services.

Based on the record, no reasonable juror could find that Plaintiffs have demonstrated the required elements of a fraud claim, including material misrepresentation and resulting damages. Therefore, summary judgment on Count VII in favor of Carlisle is warranted.

## CONCLUSION

For the reasons above, Defendant's Motion for Summary Judgment will be granted.

*/s/ Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.